J-S25037-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MANUEL LUIS SANTIAGO | : | |
| | : | |
| Appellant | : | No. 1496 EDA 2024 |

Appeal from the Judgment of Sentence Entered November 14, 2023
In the Court of Common Pleas of Northampton County Criminal Division
at No(s): CP-48-CR-0001467-2021

BEFORE: PANELLA, P.J.E., DUBOW, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED SEPTEMBER 19, 2025**

Appellant, Manuel Luis Santiago, appeals from the aggregate judgment of sentence of 10 to 20 years' incarceration, imposed after a jury convicted him of various sexual offenses committed against two minor, female victims. Appellant was also deemed to be a sexually violent predator (SVP). On appeal, Appellant challenges the court's admission of certain evidence, the discretionary aspects of his sentence, and the sufficiency of the evidence to support his designation as an SVP. After careful review, we affirm.

Briefly, Appellant's convictions stemmed from evidence that he sexually assaulted his two nieces, S.C. and M.S.[1] S.C. alleged that Appellant sexually assaulted her from 2015 to 2016, beginning when she was 11 years old. M.S.

---

[1] Appellant was also charged with various offenses based on allegations of sexual assault by his daughter, A.S. However, the jury was deadlocked and unable to reach a verdict as to any charges pertaining to A.S.

alleged that Appellant sexually assaulted her from 2017 to 2018, beginning when she was 12 years old. Following a jury trial in 2022, Appellant was convicted of two counts each of indecent assault (18 Pa.C.S. § 3126(a)(7)), unlawful contact with a minor – sexual offenses (18 Pa.C.S. § 6318(a)(1)), and corruption of a minor (18 Pa.C.S. § 6301(a)(1)(ii)).[2]

On August 21, 2023, the court conducted an SVP hearing. On October 12, 2023, it issued an order deeming Appellant to be an SVP. On November 14, 2023, the court sentenced him to the aggregate term of incarceration set forth *supra*. On November 24, 2023, Appellant timely filed a post-sentence motion. After that motion was denied by operation of law on May 17, 2024, Appellant filed a timely notice of appeal on May 21, 2024.[3] Appellant and the

_____

[2] Appellant was found not guilty of two counts of aggravated indecent assault of a child (18 Pa.C.S. § 3125(b)), and one count of attempted rape (18 Pa.C.S. § 901(a) (criminal attempt); 18 Pa.C.S. § 3121(a)(1) (rape)).

[3] Pursuant to Pa.R.Crim.P. 720(B)(3)(a), the trial court had 120 days to decide the November 24, 2023 post-sentence motion, which here would have made the deadline Monday, March 25, 2024. On March 1, 2024, however, the court entered an order granting a 30-day extension for a decision on the motion. *See* Pa.R.Crim.P. 720(B)(3)(b) ("Upon motion of the defendant within the 120-day disposition period, for good cause shown, the judge may grant one 30-day extension for decision on the motion. If the judge fails to decide the motion within the 30-day extension period, the motion shall be deemed denied by operation of law."). Because the trial court did not decide the post-sentence motion within 150 days, the clerk of courts should have entered an order on April 22, 2024, stating that the post-sentence motion was deemed denied. *See* Pa.R.Crim.P. 720(B)(3)(c) (requiring the clerk of courts to enter an order on behalf of the court when a post-sentence motion is deemed denied by operation of law). However, an order denying the post-sentence motion was not entered until May 17, 2024, 175 days after the filing of the November 24, 2023 post-sentence motion. This Court has previously held that a
*(Footnote Continued Next Page)*

- 2 -

court complied with Pa.R.A.P. 1925. Herein, Appellant states three issues for
our review:

> 1. Did the trial court err and abuse its discretion when it admitted
> the news article related to Appellant's charges dated May 4, 2021?
> Relatedly, did the trial court err when it instructed the jury on
> Appellant's alleged flight on May 5, 2021[,] as evidence of
> consciousness of guilt?
>
> 2. Did the trial court err and abuse its discretion when it imposed
> an above[-]aggravated[-]range sentence that was unreasonable
> and excessive because it failed to adequately consider mitigating
> factors, considered factors already contemplated within the
> sentencing guidelines, and considered impermissible factors?
>
> 3. Did the trial court err and abuse its discretion when it found
> that Appellant met the criteria to be classified as a sexually violent
> predator?

Appellant's Brief at 9.

In his first issue, Appellant argues that the "[t]he trial court erred and
abused its discretion when it allowed Detective Stephen O'Donnell to testify
regarding a newspaper article about the charges against [Appellant] published

---

breakdown occurs when the clerk of courts fails to enter an order deeming a
post-sentence motion denied by operation of law and notifying the defendant
of the same. *See Commonwealth v. Perry*, 820 A.2d 734, 735 (Pa. Super.
2003). When a trial court denies a post-sentence motion after the 120-day
period and the appellant then files an appeal within 30 days of the date of that
decision, this Court has found that the notice of appeal is timely. *See id.*;
*see also Commonwealth v. Braykovich*, 664 A.2d 133 (Pa. Super. 1995)
(holding that the appellant's notice of appeal was timely, as it was filed within
30 days of an untimely order denying the appellant's post-sentence motion).
Here, even though the clerk of courts failed to enter an order on April 22,
2024, denying the post-sentence motion by operation of law, Appellant's May
21, 2024 notice of appeal was filed within thirty (30) days of the May 17, 2024
order denying his post-sentence motion. Accordingly, we deem the instant
appeal as timely filed.

the night before the police attempted to execute an arrest warrant for … Appellant." ***Id.*** at 24. The trial court provided further context for Appellant's claim, as follows:

> Detective O'Donnell of the North Catasauqua Police Department testified that on May 5, 2021, he and three other officers attempted to execute a felony arrest warrant for [Appellant] at 1209 Third Street, Catasauqua, where [Appellant] resided with his parents. N.T.[ Trial,] 10/20/22[,] at 35, 39. [Appellant's] mother answered the door and advised officers that [Appellant] had been in his bedroom. ***Id.*** at 44-45. The bedroom door was locked, so [Appellant's] mother called his cellphone, which could be heard ringing inside the room. ***Id.*** at 45-47. When officers proceeded to the side of the residence, they observed the window of the ground-floor bedroom open and the screen pushed out, with no occupants inside. ***Id.*** at 50-51, 58. Detective O'Donnell then testified that the evening prior to his attempt to execute the arrest warrant, a newspaper article was published detailing the allegations against [Appellant]. ***Id.*** at 59, 63-64. The article was admitted into evidence at Commonwealth Exhibit 16. ***Id.*** at 64-66. The defense objected that the testimony regarding the article was irrelevant, and that it was speculative as to whether [Appellant] was aware of the article. ***Id.*** at 59-63. The [c]ourt concluded that the topic could be appropriately addressed on cross-examination and through closing arguments. ***Id.*** at 62-63.

Trial Court Opinion (TCO), 8/26/24, at 7-8.

Appellant now argues that it was improper for the court to permit Detective O'Donnell's testimony about the article. He avers that "Detective O'Donnell had no personal knowledge of the article for the relevant timeframe about which he was testifying … — in other words, he testified that the article was posted on May 4, 2021, but admitted he was not made aware of the article until *after* he attempted to execute the arrest warrant." Appellant's Brief at 26 (emphasis in original). Appellant points out that Pennsylvania Rule of

Evidence 602 states, in pertinent part, that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Pa.R.E. 602. Appellant stresses that, "[h]ere, it is not disputed that the detective did not author the article, nor was he aware of its existence when he attempted to execute the warrant. Therefore[,] the trial court erred in permitting him to testify to the same." Appellant's Brief at 26-27. Appellant also maintains that the article was irrelevant to Detective O'Donnell's testimony about whether Appellant was at home at the time the arrest warrant was executed.

Appellant's argument is meritless. Preliminarily, we observe that:

> The standard of review employed when faced with a challenge to the trial court's decision as to whether or not to admit evidence is well settled. Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision absent a clear abuse of discretion. **Commonwealth v. Hunzer**, 868 A.2d 498 (Pa. Super. 2005). Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will. **Id.**

**Commonwealth v. Young**, 989 A.2d 920, 924 (Pa. Super. 2010) (citation omitted).

We begin by addressing the relevancy of Detective O'Donnell's testimony about the newspaper article. The trial court concluded that it "was relevant and foundational to the Commonwealth's argument that [Appellant]

- 5 -

evaded apprehension." TCO at 8. We agree. Notably, Appellant "himself testified that he was aware of the article the night prior to the police attempting to execute the arrest warrant for him at his parents' residence." *Id.* (citing N.T. Trial, 10/21/22, at 26, 35). Thus, the detective's testimony that the article had been published the night before they sought to arrest Appellant was relevant to the Commonwealth's theory that Appellant knew about the pending charges and was attempting to evade arrest.

Moreover, the fact that Detective O'Donnell was not aware of the article at the time he executed the arrest warrant was irrelevant to the admissibility of his testimony under Rule 602. As the Commonwealth aptly contends,

> Detective O'Donnell did not assert that either he or [Appellant] knew of the existence of the news article at the time the officers attempted to arrest [Appellant]. Nor did he assert that the news article itself proved that [Appellant] was home at the time of the attempted arrest or that he fled the home. Detective O'Donnell simply testified to the facts of what occurred when officers attempted to arrest [Appellant] on May 5, 2021[,] and that a news article had been published about [Appellant's] criminal charges the day before. It was not Detective O'Donnell's state of mind at the time of the attempted arrest that mattered but [Appellant's]. It would be up to the jury to decide, considering the totality of not only Detective O'Donnell's testimony but any other evidence the Commonwealth might later introduce, whether [Appellant] had been home at the time of the attempted arrest, whether [Appellant] knew about the news article at that time, whether [Appellant] fled the home, whether it was the news article that motivated [Appellant] to flee, and whether [Appellant's] flight demonstrated consciousness of guilt.

Commonwealth's Brief at 6 (emphasis omitted).

The jury instruction ultimately provided by the court made these points amply clear to the jury, as the court stated:

- 6 -

> There was evidence, including the testimony of Detective Stephen O'Donnell[,] that tended to show that [Appellant] fled from the police when they attempted to take him into custody at his home. [Appellant] himself denied he fled and explained his behavior after he learned from a newspaper article of the charges against him. The credibility, weight, and effect of this evidence is for you to decide. Generally speaking, when a crime has been committed, and a person thinks he or she is or may be accused of committing it, and he or she flees or conceals himself or herself, such flight or concealment is a circumstance tending to prove the person is conscious of guilt. Such flight or concealment does not necessarily show consciousness of guilt in every case. A person may flee or hide for some other motive and may do so even though innocent. Whether the evidence of flight or concealment in this case should be looked at as tending to prove guilt depends upon the facts and circumstances of this case and especially upon motives that may have prompted the flight or concealment. You may not find [Appellant] guilty solely on the basis of evidence of flight or concealment.

N.T. Trial, 10/21/22, at 149-50. We agree with the court that this "charge was clear, adequate, and legally accurate." TCO at 9.

In sum, Appellant has failed to demonstrate any abuse of discretion in the court's admission of Detective O'Donnell's testimony concerning the news article. That testimony was relevant to the Commonwealth's theory that Appellant knew about the pending criminal charges and fled from police when they attempted to execute the arrest warrant, which was indicative of his consciousness of guilt. The detective never claimed that he or Appellant knew about the article at the time the warrant was executed; he simply testified that the article was published the day before the officers went to Appellant's residence to arrest him. Appellant then admitted that he was aware of the article the day before officers arrived at his home to arrest him. We discern no abuse of discretion in the court's admitting this evidence.

Relatedly, we also do not conclude that any relief is due on Appellant's cursory argument that "the Commonwealth did not introduce sufficient evidence to warrant a jury instruction as to flight as evidence of consciousness of guilt." Appellant's Brief at 24. Notably, Appellant does not meaningfully develop any argument, supported by citations to pertinent legal authority, to support his challenge to this jury instruction. Instead, he merely states that it was improper because the only evidence to support it was his own testimony that he knew about the news article, which he was compelled to give by the court's erroneously overruling his objection to Detective O'Donnell's testimony about the article. *Id.* at 26. Given our conclusion that the detective's testimony was properly admitted, Appellant's challenge to the jury instruction necessarily fails. His testimony that he knew about the news article the night before officers attempted to arrest him, combined with Detective O'Donnell's description of what transpired during the execution of the arrest warrant, was sufficient evidence to support the court's instruction on flight as evidence of consciousness of guilt.

In his next issue, Appellant alleges that the court fashioned an unreasonable and excessive sentence by imposing terms of incarceration in the aggravated range of the Sentencing Guidelines, without adequately stating its reasons for doing so. Appellant also complains that the court relied on impermissible factors and focused primarily on the seriousness of his offenses, while failing to adequately consider the mitigating circumstances.

Appellant's arguments implicate the discretionary aspects of his sentence.

> Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. ***Commonwealth v. Sierra***, 752 A.2d 910, 912 (Pa. Super. 2000). An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:
>
>> We conduct a four-part analysis to determine: (1) whether [the] appellant has filed a timely notice of appeal, ***see*** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, ***see*** Pa.R.Crim.P. [720]; (3) whether [the] appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[] § 9781(b).
>
> ***Commonwealth v. Evans***, 901 A.2d 528, 533 (Pa. Super. 2006)…. Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or in a motion to modify the sentence imposed. ***Commonwealth v. Mann***, 820 A.2d 788, 794 (Pa. Super. 2003)….
>
> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. ***Commonwealth v. Paul***, 925 A.2d 825, 828 (Pa. Super. 2007). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." ***Sierra***, ***supra*** at 912–13.

***Commonwealth v. Griffin***, 65 A.3d 932, 935 (Pa. Super. 2013) (quoting

***Commonwealth v. Moury***, 992 A.2d 162, 170 (Pa. Super. 2010)).

Here, Appellant preserved his claims in a timely-filed post-sentence motion, and filed a timely notice of appeal. He has also included a Rule 2119(f) statement in his appellate brief, and we conclude that the issues he

raises constitute substantial questions for our review. *See Commonwealth v. Macias*, 968 A.2d 773, 776 (Pa. Super. 2009) ("The failure to set forth adequate reasons for the sentence imposed has been held to raise a substantial question. Likewise, an averment that the court sentenced based solely on the seriousness of the offense and failed to consider all relevant factors raises a substantial question. Finally, an allegation that the court considered an impermissible sentencing factor raises a substantial question.") (internal citations omitted). Thus, we will review the merits of Appellant's claims. In doing so, we are mindful that,

> [s]entencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Shugars*, 895 A.2d 1270, 1275 (Pa. Super. 2006).

Appellant first points out that "every sentence imposed [in this case] was beyond the aggravated range, *i.e.*, outside the guidelines." Appellant's Brief at 36. Thus, this Court must vacate his sentence if we find that it is unreasonable. *See* 42 Pa.C.S. § 9781(c)(3) ("The appellate court shall vacate the sentence and remand the case to the sentencing court with instructions if it finds: … the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable."). Appellant claims his sentence was unreasonable because the court focused on the age of the victims, which "is

already contemplated in the charges for which Appellant was convicted." Appellant's Brief at 36. He also complains that in focusing on the impact to the victims' family, the court improperly cited "the tension between [Appellant's daughter] (the alleged victim for whom Appellant was *not* convicted) and [her] paternal grandparents, who remained supportive of Appellant…." *Id.* at 37. Appellant insists that "[i]t was improper to focus, or base a sentence, on anything related to [his daughter,] given the hung jury on the ten charges related to her." *Id.* Appellant also argues that the court focused only on the seriousness of his offenses, without adequately taking into account the mitigating factors of his "minor criminal history and his long-standing work history." *Id.* at 38.

Appellant's arguments do not demonstrate that the court's sentencing decision was an abuse of discretion, or that the court fashioned an unreasonable term of incarceration. In assessing whether a sentence is reasonable, this Court must consider the following:

> (1) The nature and circumstances of the offense and the history and characteristics of the defendant.
>
> (2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.
>
> (3) The findings upon which the sentence was based.
>
> (4) The guidelines promulgated by the commission.

42 Pa.C.S. § 9781(d).

Instantly, the trial court provided the following rationale for rejecting Appellant's sentencing challenges:

In the instant matter, the [c]ourt reviewed extensive materials prior to imposing sentence, including: a pre-sentence investigation report and supplemental pre-sentence investigation report, a sexual offender assessment with addendum and rebuttal addendum, a psychosexual and psychological evaluation, Commonwealth's sentencing memorandum, transcripts, and victim impact statements. N.T. [Sentencing,] 11/14/23[,] at 24-25. The [c]ourt specifically reviewed the sentencing guideline ranges for each offense, noting the offense gravity score, [Appellant's] prior record score, the standard, mitigated, and aggravated ranges, as well as the statutory maximums. *Id.* at 30-32. The [c]ourt explained that aggravated[-]range sentences were imposed for the following reasons:

First of all, there are two victims[,] one after the other. And it would make no sense to me to sentence all of those sentences concurrent. There's no volume discount in this [c]ourt because of one or more than one victim. So that's the reason that I imposed the sentence between M.S. and S.C. consecutive[ly].

Furthermore, the age of the victims and the age of [Appellant] at the time of the offenses were anywhere from 27 to 33 years of age for [Appellant] and for each of these two victims[, who were] 11 and 12 years of age.

Thirdly, the victims were members of [Appellant's] family. These were not strangers. They were his nieces. The assaults occurred over a period of -- in S.C.'s case, from 2015 to [20]16[,] and in M.S.'s case 2017 to [20]18. You notice that those offenses are … one after the other? From 2015 to [20]16 and then [20]17 to [20]18.

There's a devastating addition, a reason for the aggravation. The impact on the victims, M.S. and S.C., and their extended family is devastating. What was particularly difficult for me to hear, frankly, during the trial, was the testimony between one of the alleged victims and the grandmother about the members of [Appellant's] family and the victims' family – hav[ing] to make choices between who their [*sic*] going to support, who they believe and don't believe. That's something very difficult and intimate as these allegations were. During the course of the assaults, another reason for the aggravated range – [Appellant] told the victims not to tell or he would get in trouble, elevating

- 12 -

concern for himself over the welfare and concern of his minor nieces and making the victims, that is S.C. and M.S., feel that they should be guilty or feel guilty if they should report [Appellant's] behaviors, imposing a burden of guilt or psychological guilt on the wrong party. Also, the location of these offenses and the proximity of other family members made these assaults particularly brazen, indicating how difficult any efforts of rehabilitation may be.

In addition to that, there was a pattern to the assaults in terms of the way they occurred and also that the victims, both of the victims, were toward the end of or at the end of their prepubescent lives, indicating to me that [Appellant] has a sexual problem with women who are at that stage of their developmental life.

In addition, both experts, Ms. [Paula Brust] on behalf of the Commonwealth and … [Thomas F. Haworth, Ph.D.,] on behalf of [Appellant], testified and agreed that [pedophilic] disorder is a lifelong incurable condition and has a high rate of sexual recidivism. For all of those reasons[,] I believe an aggravated range in each instance is warranted and that's why I imposed the sentence that I did.

With respect to indecent assault and unlawful conduct, I ran those sentences concurrent because I do think that, although I may not have been obligated to run them concurrent, I think that those offenses are substantially similar and one includes the other. Maybe not in every respect, but substantially, so that I decided to run them … concurrent[ly]. And the sentencing in corruption of minor charges ran consecutive to those, because there was an additional component of how it affected the morals of the victims.

N.T. [Sentencing] … at 54-56. The [c]ourt clearly provided the "the factual basis and specific reasons which compelled [the deviation] from the guideline range." ***Commonwealth v. Mouzon***, 828 A.2d 1126, 1128 (Pa. Super. 2003). The [c]ourt appropriately considered the nature and gravity of the offenses, the significant impact on the lives of the victims, and the challenges in rehabilitating [Appellant] in fashioning [his] sentence. The sentence complied with the requirements of the [S]entencing [C]ode, did not exceed the applicable statutory

maximums, and based on the foregoing, cannot be considered an abuse of discretion.

TCO at 17-19.

We agree with the trial court. Although the court mentioned the victims' ages, it did not rely in any significant fashion on this factor. Nor did the court rely heavily on any factor involving Appellant's daughter; instead, the court stressed the significant impact of Appellant's crimes on M.S. and S.C., as well as their entire family. In regard to mitigating factors, we presume the court was aware of those considerations and took them into account, as it had the benefit of a pre-sentence report. *See Commonwealth v. Bullock*, 170 A.3d 1109, 1126 (Pa. Super. 2017) (stating that where the sentencing court has and reviews a pre-sentence report, we "presume[] that the court [was] aware of all appropriate sentencing factors and considerations") (citation omitted). Finally, the record adequately demonstrates that the court did not focus solely on the seriousness of Appellant's offenses, and it provided sufficient justification for imposing terms of incarceration above the aggravated guideline ranges. No relief is due.

Finally, Appellant challenges the court's decision to designate him as an SVP. This Court has explained:

A challenge to a trial court's SVP designation presents a challenge to the sufficiency of the evidence for which our standard of review is *de novo* and our scope of review is plenary. A challenge to the sufficiency of the evidence to support an SVP designation requires the reviewing court to accept the undiminished record of the case in the light most favorable to the Commonwealth. The reviewing court must examine all of the Commonwealth's evidence without consideration of its admissibility. A successful sufficiency

challenge can lead to an outright grant of relief such as a reversal of the SVP designation, whereas a challenge to the admissibility of the expert's opinion and testimony is an evidentiary question which, if successful, can lead to a new SVP hearing. We will reverse a trial court's determination of SVP status only if the Commonwealth has not presented clear and convincing evidence that each element of the statute has been satisfied.

*Commonwealth v. Aumick*, 297 A.3d 770, 776-77 (Pa. Super. 2023)

(cleaned up).

We explained in *Aumick* that

[t]he procedure for determining SVP status is statutorily mandated and well-defined. *See Commonwealth v. Dixon*, 907 A.2d 533, 535 (Pa. Super. 2006). Under revised Subchapter H of [the Sexual Offender Registration and Notification Act (SORNA), 42 Pa.C.S. §§ 9799.10-9799.41,] after a person has been convicted of an offense listed in section 9799.14, the trial court orders an assessment by the [Sexual Offender Assessment Board (SOAB)]. *See* 42 Pa.C.S.[] § 9799.24(a). The SOAB must assess all individuals convicted of sexually violent offenses to determine whether they should be classified as an SVP. *See id.* § 9799.24(b). When assessing whether a particular offender should be classified as an SVP, "the board shall establish standards for evaluations and for evaluators conducting the assessments." *Id.*

A SOAB board member conducts the assessment to determine if the individual should be classified as an SVP.

*Id.* at 777 (footnote omitted). The SOAB assessment covers fifteen factors delving into the facts of the offense, the individual's prior offense history, and characteristics of the individual. *See* 42 Pa.C.S. § 9799.24(b)(1)-(4). "After completing its assessment, the SOAB member must prepare and submit a written report to the district attorney, who may file a praecipe for a hearing on the matter." *Aumick*, 297 A.3d at 777 (citing 42 Pa.C.S. § 9799.24(d), (e)(1)).

If a hearing is conducted, "the trial court must determine whether the Commonwealth has proven by clear and convincing evidence that the defendant is an individual who has 'a mental abnormality or personality disorder that makes the individual likely to engage in predatory sexually violent offenses.'" *Id.* at 778 (quoting 42 Pa.C.S. § 9799.12 (providing the definition of a "sexually violent predator")). Because "[a]n SVP assessment is not a trial or a separate criminal proceeding that subjects the defendant to additional punishment[,]" it "does not require proof beyond a reasonable doubt[,]" but only a showing "of clear and convincing evidence that the offender is, in fact, an SVP." *Id.* at 779 (cleaned up).

Here, Appellant claims that the evidence was insufficient to prove he has a mental abnormality or personality disorder that makes him likely to engage in predatory sexually violent offenses. By way of background, at Appellant's SVP hearing, Paula Brust testified for the Commonwealth as an expert in performing sexual offender evaluations. N.T. SVP Hearing, 8/21/23, at 21. Ms. Brust, a member of the SOAB, testified that the SOAB follows standards in conducting SVP assessments, which include utilizing the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5) "as the guideline … to find out whether or not … the defendant meets [the] criteria" for an SVP. *Id.* at 22-23; *see also id.* at 32 (Ms. Brust's clarifying that her references to the DSM meant the DSM-5). Ms. Brust testified that, based on her assessment of Appellant, she opined that he "met the criteria set forth in the DSM[-5] for pedophilic disorder." *Id.*

at 31.  When asked to describe the "characteristics" of that disorder, Ms. Brust explained, in pertinent part:

> [Ms. Brust:] Characteristics are [that] over a period of at least six months recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual contact with **a prepubescent child, generally age 13 years of age or younger**.

*Id.* (emphasis added).  Ms. Brust reiterated that under the DSM-5, minors under 13 years of age are "generally" considered prepubescent, and the DSM-5 does not in any way require an evaluator to do "any independent investigation to determine precisely when a minor child has completed puberty[.]"  *Id.* at 32.  In fact, in the "thousands of assessments" that Ms. Brust has done for the SOAB, she has never done an independent assessment of whether the minor child at issue in the case had "begun or finished puberty[.]" *Id.* at 33.

However, Appellant's expert at the SVP hearing, Thomas F. Haworth, Ph.D., offered a different opinion regarding the definition of "prepubescent." Dr. Haworth testified:

> [Dr. Haworth:] Prepubescent is actually scientifically defined on the Tanner scale.  [The] Tanner scale, it's what pediatricians and other people who work with children, developmental psychologists, for example, will use to understand their level of maturity and obtaining their level of maturity.  It's ranked one through five.  And [the scale adjusts] as an individual has certain developed changes between … their body type and how their body forms and the presence then of beginning signs of puberty.
>
> For example, in girls, budding of the areola prior to breast budding and this whole sort of thing.  And certainly the presence of

menarche[,[4]] with the starting of menses, these are parts of the Tanner scale that defines maturity.

So prepubescent is where there is nothing. There are no secondary sexual characteristics or budding breasts or anything else. Because as soon as there's menarche, as soon as there's the presentation of these elements, we are now rising in the Tanner level, and we could be somewhere between -- you know, so there's prepubescent, there's pubescent, there's peripubescent, and there's postpubescence.

*Id.* at 101-02. In other words, he testified that the fact that a child is under the age of thirteen, alone, does not mean that she is prepubescent. *Id.* at 107.

Now, on appeal, Appellant contends that given Dr. Haworth's testimony, the Commonwealth failed to prove that the victims in this case were prepubescent. He stresses that,

M.S. was 12 years old at the time of the assault; the record was silent as to whether she had formed any secondary sexual characteristics at that time. S.C. … testified that she had begun developing breasts and had begun menarche at the time of the assaults. Finally, alleged victim, A.S., testified that she similarly had begun developing breasts and had begun menarche at the time of her alleged assaults.[5]

Appellant's Brief at 44.

---

[4] "Menarche" is the medical term for an adolescent's first menstrual period. *Menarche*, Dictionary.com, https://www.dictionary.com/browse/menarche (last visited Aug. 27, 2025).

[5] Although Appellant was not convicted of offenses regarding A.S., he "acknowledges that … *Aumick* … allows an expert to rely on inadmissible evidence and unproven allegations in forming an opinion as to whether a defendant meets the criteria to be declared an SVP." Appellant's Brief at 45 (citing *Aumick*, 297 A.3d at 782 (explaining that, "in the context of an SVP hearing, the judge is not tasked with evaluating the veracity of the facts underlying the expert's testimony")).

We disagree. In the court's opinion accompanying its order deeming Appellant an SVP, the court concluded that the Commonwealth had at least "established[,] by clear and convincing evidence[,] that M.S. was prepubescent at the time [Appellant] first assaulted her." Trial Court Opinion, 10/12/23, at 9. The court noted that "M.S. … was twelve years old when the assaults began against her, … [and] no evidence was elicited regarding whether she had begun developing breasts, menarche, or had any of the other secondary sex characteristics when she was first assaulted by [Appellant]." *Id.* at 7 (citing N.T. Trial, 10/18/22, at 232). "[N]either side presented any evidence, such as medical records or testimony of other individuals at trial or at the SVP hearing with respect to her developmental condition at the time the assaults against her began." *Id.*

The court then explained:

[Ms.] Brust concluded [that] M.S. was prepubescent at the time the assaults began against her on the basis that M.S. was twelve at that time and, in the absence of any evidence to the contrary, the DSM[-5] assumes minors are generally considered prepubescent if under the age of 13 years. She testified it was the "widely accepted" practice in her field that if no information on a child's stage of puberty exists, the default is to the DSM[-5] guidelines[,] which assume children under the age of thirteen years are generally prepubescent. In other words, she concluded M.S. was prepubescent solely on the basis of her age, and as a result of that determination, [Appellant] met the criteria for pedophilic disorder.

[Dr.] Haworth disagreed. He said in the absence of data[,] one cannot presume prepubescent [*sic*]. He said [that,] based upon his training, expertise and study of the literature pertaining to the age of onset of puberty in the current times, M.S. was "likely pubescent" at the time the assaults began against her.

Specifically, he referred to various studies that concluded that the average age of puberty has fallen over the years, [now being] somewhere between 9.5 and 10.9 years of age for Hispanic females, and said the DSM[-5]'s reference to the age of thirteen was a carry-over from earlier editions of the DSM and is out-of-date now. Furthermore, [Dr.] Haworth administered the Abel Assessment of Sexual Interest Test, 3rd edition, to [Appellant], which measures an individual's arousal based upon their reaction to visual stimuli. [Dr.] Haworth opined this test was widely accepted in the field and, in this case, showed [Appellant] had no interest in prepubescent females or males. [Dr.] Haworth also administered the Millon Clinical Multiaxial Inventory, 4th edition, which "taps" both psychopathology and personality functioning. Therefore, in the absence of any evidence to the contrary, and with the results of the testing, [Dr.] Haworth would not conclude [Appellant] suffered from pedophilic disorder. Instead, he characterized [Appellant's] behavior as "child molestation."

[Dr.] Haworth did not challenge [Ms.] Brust's representation that it is the "widely accepted" practice in their field that the DSM[-5] guidelines are the default standard if no information exists on a child's stage of puberty. As for the studies pertaining to the early on-set of puberty [Dr.] Haworth referred to at the hearing, he did not cite to any of them in his report; bring any of them[,] … articles about them, or citations to them[] to [c]ourt; or represent that they were peer-reviewed. The clinical tests [Dr.] Haworth relied upon are not dispositive of [Appellant's] classification as a[n] SVP. While such testing may be relevant, it is not persuasive. As already noted, SORNA "does not require proof of a standard of diagnosis that is commonly found and/or accepted in a mental health diagnostic paradigm." [**Commonwealth v.**] **Dengler**, 890 A.2d [372,] 383 [(Pa. 2005)….6] In fact, the Abel Assessment of

_____

6 In **Dengler**, our Supreme Court examined whether the opinion testimony of an expert witness at an SVP hearing is subject to the Pennsylvania test of admissibility for novel scientific testimony derived from **Frye v. United States**, 293 F. 1023 (D.C. Cir. 1923). In concluding that it is not, the Court stressed that "the 'science' here (and the SVP designation consequences it triggers) is responsive to, indeed it is a direct byproduct of, a specific legislatively-adopted scheme which sets forth the relevance and contours of the challenged evidence." **Dengler**, 890 A.2d at 383. Accordingly, "[t]he question of SVP status is thus a statutory question, not a question of 'pure

*(Footnote Continued Next Page)*

Sexual Interest Test[,] which purports to test an individual's reaction to various images of persons of different ages and which [Dr.] Haworth relied on, defines post[-]pubescent females as between the ages of fourteen and seventeen and prepubescent females as between the ages of six to thirteen, the same as the DSM[-5]. As for the DSM[-5], [Dr.] Haworth described it as a tool to access care for people who have various conditions. It was not developed, he said, "with a notion of identifying people who were dangerous and … needed to be contained," [or] that is, to make forensic decisions. And, to the extent [Dr.] Haworth finds the DSM[-5] to be out-of-date, even he acknowledged that after some "argument" about whether the age utilized in the definition of pedophilic disorder needed to be altered, it was decided to leave this standard unchanged. In other words, the profession seems to adhere to the view that, generally, one is still presumed to be prepubescent at the age of thirteen years or younger, and that [Dr.] Haworth's opinion on the matter is, for now at least, a minority one.

*Id.* at 7-9 (some citations omitted).

We agree with the trial court that, based on this record, the Commonwealth established, by clear and convincing evidence, that Appellant suffers from pedophilic disorder. Although Ms. Brust and Dr. Haworth differed in their opinions on the definition of "prepubescent," the court was free to credit Ms. Brust's definition and opinion that M.S. was prepubescent and reject Dr. Haworth's contrary position. *See Commonwealth v. Moody*, 843 A.2d 402, 408 (Pa. Super. 2004) ("[A] fact-finder is free to believe all, part or none

_____

science' and, at least in the absence of a challenge to the propriety of the substance of the statute, the question of evidentiary relevance is framed by the very provisions of the statute itself, not some external source." *Id.* Accordingly, the *Dengler* Court rejected the argument that an SVP expert's testimony must "square with prevailing standards and methodology in the psychological and psychiatric diagnostic communities[,]" as "[t]he statute does not require proof of a standard of diagnosis that is commonly found and/or accepted in a mental health diagnostic paradigm." *Id.*

of the evidence presented."). Ms. Brust's considering M.S. prepubescent because she was under the age of 13, where the record contained no evidence suggesting she had begun puberty, was in line with the DSM-5. Appellant did not argue below, and does not contend on appeal, that the SOAB should not utilize the DSM-5 in conducting its SVP assessments. Accordingly, the record supports the trial court's determination that Appellant meets the statutory criteria for designation as an SVP.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/19/2025